The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, everybody. Please be seated. All right, our first case is Dyer v. Smith. Mr. O'Heron, whenever you're ready, sir. Good morning, Your Honors. May it please the Court, John O'Heron on behalf of Shirrellia Smith and Natalie Statton. The District Court erred here by doing something that the Supreme Court of the United States has refused to do for over 40 years, which is extend a Bivens remedy to a new Bivens context. The plaintiff filed a First Amendment and a Fourth Amendment claim against my clients, both of whom are TSA agents. After correctly finding on our motion to dismiss that both claims presented new Bivens contexts, the District Court nevertheless proceeded and erred by holding that there were no special factors that counseled hesitation by denying our motion to dismiss and allowing the case to proceed. We are now here on appeal asking this Court to reverse that decision. The District Court's decision was error at the time it was made under Supreme Court precedent and this Court's precedent applying Supreme Court precedent, most notably the Supreme Court's decision in Ziegler v. Abbasi. That error is even more pronounced now since this past June's ruling by the Supreme Court in Egbert v. Boulay. At the outset, the plaintiff does not dispute the District Court's finding that these two claims present new Bivens contexts. So the only issue on appeal is that special factors inquiry. The special factors inquiry the Supreme Court in the Egbert decision this past June stated really boils down to a single question. And it's answering the question this Court has characterized the Supreme Court's jurisprudence in this area as open hostility to expanding Bivens. The single question really is about separation of powers. This comes down to whether an implied cause of action can exist. And that question is, the Supreme Court has stated time and time again, in almost every single case going to be a decision for Congress to make, not the courts. The question really is whether the judiciary is well suited, here the District Court found that it was, to consider the pros and cons, the costs and benefits of extending Bivens remedies to a new context. I have a question about the special factors. What is the alternative remedial scheme here that the appellees could have undertaken? So we believe there are two. And it's important to note that the alternative remedial scheme is analyzed at a very general level. It's not analyzed at a granular level. The Supreme Court has made clear that it might not include damages. It might not include the plaintiff's ability to participate. It might not include a right to appeal. So it might not map neatly onto the specific claims in this case. But that being said, there are two. One is the TRIP program, which is authorized by Congress under 49 U.S.C. 44-926. And on its face, and the Third Circuit recognized this. How do the appellees participate in the TRIP program? Well, the TRIP program, and as administered by the Department of Homeland Security, seems to suggest that any traveler who feels that they have been delayed for boarding their flight based on being flagged as a threat, and that's the term used. It might not map neatly, and we concede that. Because they weren't flagged as a threat, correct? No, and I think if the plaintiff were to try to proceed that way, it may come down to are you a threat by videotaping at the security station as alleged. And it might not be the case. But the point on alternative remedial schemes isn't sufficiency to the plaintiff. The point is congressional intent and deterrence to the federal officers. The other alternative remedial scheme that may be available is the complaint that the plaintiff could file under the Office of Civil Rights and Civil Liberties. Was that option argued before the district court? We may have only invoked the TRIP program. I can't recall in our motion to dismiss. Does it matter? I mean, can we consider it? I'm sorry. Yeah, I don't think it matters. I think that if this court finds that congressional intent and the deterrence factor, that Congress has considered the issue of what rights to provide to travelers and has decided not to provide a cause of action, that's sufficient. And that can be a single and dispositive special factor that this court finds. I want to make sure I understand what you just said. So you're saying it doesn't matter because of the TRIP alternative remedy, not because we should overlook the fact that if you didn't raise it below, we can still consider it or something like that? I think both. I think the TRIP program by itself is enough to show congressional intent and deterrence that Congress has considered this. I think even if we didn't raise the civil rights complaint in our motion to dismiss, it would be an alternative ground to reverse, and this court could find it. Well, I mean, the general rule is we're inclined to find alternative grounds to affirm, but we're not quite as eager to make arguments for the other side to reverse a district court judge. Understood, and I think in that the TRIP program is sufficient. My colleague from the Department of Justice that we're sharing argument time with is going to address perhaps the most critical special factor, which is the national security implications of extending Bivens to TSA agents. And then the Supreme Court case precedent also considers the impact on governmental operations more broadly, system-wide consequences of extending Bivens to TSA agents. And here that's a significant factor. What is going to happen if Bivens is extended to TSA agents? How might that affect training? How might that affect job performance? How might that affect civil liability for the United States government? To discuss these questions is to answer the dispositive question. To discuss the policy pros and cons itself is a special factor that that discussion dictates this court must reverse the district court. And it is in the plaintiff disputes that it can be both congressional silence and congressional action, but that is indeed what this court has said and what the Supreme Court has said. The TSA was created in 2001, and since that point the authorizing statutes have been amended many times, and Congress has never seen fit to create a cause of action against TSA agents. And by the same token, Congress has authorized certain alternative remedies for travelers who feel they are aggrieved, and their congressional action suggests that this court must hesitate. This court need only find a single reason, and it's not a single reason that a Bivens remedy shouldn't exist. It's a single remedy to think that Congress should be the one to consider it. It's a remarkably low threshold, as the Fifth Circuit has stated. This court has recognized that it is a remarkably low standard, and it is one that is, we believe, easily met here. The decision of the district court should be reversed, and at this point, without further questions, I'll cede my time to the United States. Thank you, Your Honor. Thank you, Mr. O'Heron. Ms. Patti? I hope I pronounced your name correctly. If not, please correct me. Patti, thank you. We'll hear from you. Good morning, Your Honors, and may it please the Court, Catherine Patti for the United States. As this court and the Supreme Court have made clear, the key question in Bivens cases arising in new contexts is who should decide whether to create a damages remedy, Congress or the courts? As the Supreme Court just said in Egbert, the answer will be Congress in most every case, and that is especially so where national security is at issue. Thus, a Bivens remedy is foreclosed here when lawsuits against TSA agents for their conduct at airport screening checkpoints plainly implicate national security. I welcome the Court's questions. So is it fair enough that TSA implicates national security? Is that our inquiry, or is the inquiry whether the circumstances about which this claim arose implicate national security? The former, Your Honor. The Supreme Court was very clear in Egbert that this analysis is not to be conducted in light of the particular circumstances of the case, but rather at a broader level of generality. So in Egbert, the Supreme Court considered the argument that it should decide whether the damages remedy should be created against Aja Egbert himself, and the Court twice emphasized that, no, that was not the question, and the question was whether a damages remedy should be created against any Border Patrol agent generally. The analogy here is whether a damages action should be created against TSA agents for their conduct at airport screening checkpoints generally. How could national security be at risk when the policy itself allowed for recording of the TSA agents? Your Honor, there's certainly a national security interest in maintaining order at a security checkpoint, and that will require judgments about whether certain expressive conduct is okay or whether it is distracting or disruptive enough to cause a problem. So these judgments are- But doesn't the policy say it's okay to record? The policy does say that it is okay to record, but so long as the recording does not become disruptive. So there is some judgments that TSA screeners need to make here, and TSA is very committed to respecting the First and Fourth Amendment rights of airline passengers. It is also committed to protecting us from terrorist attacks, and distractions at the airport security checkpoint can get in the way of TSA's ability to protect us. And in ruling today, do we consider whether what happened there could be considered a distraction? No, Your Honor. The analysis is to be considered at this higher level of generality, whether the judiciary is, as the court said in Egbert, undoubtedly better positioned than Congress to create a damages action against TSA screeners in this context. And here there are plainly national security implications to TSA screeners' decisions about maintaining order at security checkpoints. And the prospect of personal liability for making a judgment that falls on the wrong side of the line would influence the way that TSA screeners go about making these decisions. And perhaps that would be for the better, perhaps that would be for the worse, but in any case it's for Congress to decide. There's discussion about national security, and I understand that, and you've answered some questions about that. Does the purview of TSA also relate to general aviation safety in a way that doesn't have to address national security? I'm not sure I understand your question, Your Honor. I think general aviation safety is also the concern of FAA, for example, but TSA's whole reason for being is national security. Do you have anything further? No, Your Honors.  We ask this court to reverse. Mr. Corbett, pleased to hear from you.  Jonathan Corbett for Appellee. Something the government just said struck me and is causing me to divert from my planned notes here. It was that TSA is committed to protecting the First and Fourth Amendment rights of travelers. My practice specializes in representing people agreed by TSA. My clients have been strip searched, including a child. My clients have been body cavity searched at the side of the airport checkpoint. They've abused the disabled, the elderly. Regardless of TSA as an agency's commitment to the First and Fourth Amendment rights of travelers, people— And to be clear, all those things you just listed occurred in other cases, not this one, correct? Yes, Your Honor. Regardless of TSA's agency commitment to those things, individual checkpoint screeners sometimes deviate from those ideals, and this is to be expected when we have an agency that has 2 million passengers per day going through their checkpoints under a search regime that is as close to the constitutional border of the Fourth Amendment as possible. They're putting their hands on passengers all the time. So we should expect that there are going to be occasions where that goes too far, and there needs to be some kind of remedy when that happens. There's no dispute that Egbert is a disaster for anyone with a constitutional injury caused by the federal government. It severely limits their remedies. And luckily the court in Egbert did not take that concurring opinion's idea that we should just get rid of Bivens. They left the door open, and so we can ask if there is a way to distinguish that case from the instant case. And there is. Egbert at page 9 states the Supreme Court reversed the Ninth Circuit because of the border security context and because there were no alternative remedial processes. And at 14 it said that there are no Bivens remedies available for First Amendment retaliation claims. Unlike Egbert, Appellant is not a border officer, and we have a purely domestic dispute for which there is no real remedial process actually designed to hear these kinds of claims. The district court already made those findings before Egbert came out that there was no national security or border security context and that there was no real remedial process. What's the authority, Counselor, that I think is a fair argument, perhaps, that your clients did not necessarily create a national security context? Is that how we look at it? Your colleagues say we don't really look at the fact-specific claims as much as we look at the broader categories about which TSA was created. And to be fair, that's how I read the cases, too. If you have one that talks about that more granular level that you want to direct us to, I'd be very interested in that. Your Honor, I'm inclined to agree with both of you that the law is not going to look at it at the individual case level. But if we go up just a little bit higher to the job of TSA screeners, they're not engaging in some kind of diplomacy or state secrets or anything along the lines that Customs and Border Patrol end up doing. They're simply airport security. They're looking for bombs and guns and dangerous things. And just because the agency at a much higher level has these national security interests doesn't mean that this- I think that the words national security or national security context are a little bit more narrow than that. Because if it were just that, Bivens would never exist. Pretty much every agency deals with some kind of national security, the FBI, the federal narcotics officers that were a part of the original Bivens case itself. But the court has all but said it's decided today Bivens wouldn't exist. And just to change from that case, our Tuncos decision is talking about ICE agents, which they're likewise not involved in diplomacy and things like you're talking about. It seems like even at that slightly higher level, it still runs into cases that kind of look at it a different way. So I think we have to distinguish between the FBI DEA agents where Bivens does apply and then on the other side these Border Patrol or Customs or Immigration officer where it doesn't. Where does TSA fit? It's somewhere in between the two of those. And traditionally courts have given great leeway to the federal government for what they do at the border or with immigrations and so forth. Immigrations decisions often aren't even challengeable in court at all. The government's administrative search doctrine, the border search doctrine, all grow from what we allow, what we say that the Constitution gives the federal government almost inherently the right to control the borders in that way. So I would submit to the court that TSA is between those two, but it's closer to a general law enforcement type category where the day-to-day is not finding Osama bin Laden. That's not their goal. That's a fair argument, but do we ignore the reality that TSA was created in the wake of 9-11? Absolutely not. And at the high level, certainly if we were to challenge a policy of the TSA or something that happened at a much higher level, I think that national security context may be involved. But to say that the people that run metal detectors are somehow immune just because something serious could happen. So you would have us make a distinction based on the type of work that's being done? That seems to be the very kind of analysis that the Supreme Court and others have warned us against. Well, I think that to some extent Bivens jurisprudence has required us to look at the level of the officer. I think that that was one of the special factors that the Supreme Court put forth in Ziggler, whether they were the same level of agent as an existing Bivens context. So I think there is a difference. I think that's saying that anyone who works for TSA is close enough to national security context that we can't hold them accountable for anything. Well, but even if we could make that distinction, and I'm not sure that we can, what we're dealing with are screeners, sort of the very tip of the spear in terms of trying to prevent harm. And admittedly, it could be harm from a domestic agent, but it could equally be harm from a foreign agent. And I don't know that courts are in the best position to make that distinction. Your Honor, it is a tough distinction to make. I'm going to be candid with the court that this Egbert case makes it very difficult to figure out where that line is. The concurring opinion by Justice Gorsuch about, you know, leaving the door open or pretending to, but not leaving it shut so tight that it's not really likely anyone's going to get through, that may be what the Supreme Court was trying to do here. Although I don't think so. They had no problem overturning Roe v. Wade in its entirety when they wanted to do that. So why wouldn't they overturn Bivens in its entirety if they really wanted to do that? So I think that there is a door that's open here for some kind of claims that are at least close to analogous to that which we saw in Bivens. And here we have, you know, a search of a person done by a federal officer. So that's the basis and the core. If I can talk a little bit about the remedial structures that were brought up. The two that were brought up were TRIP and the CRCL. And I think that congressional intent is just lacking there to consider these remedial schemes, at least as appropriate for this. So the TRIP program is for people that are on the no-fly list or some other list wrongly. It's not for someone who, even if they're misbehaving at a checkpoint and are identified by a low-level screener as a problem, can use to get some kind of anything, really. The TRIP process is also entirely opaque. You submit a complaint to TRIP. They send you back a yes or a no, and that's it. You don't get any right to submit evidence, to argue, to even to hear why a decision was made. You may be right, but I didn't realize, and I appreciate the no-fly list context of TRIP, but is it the case that only people who are wrongfully on the no-fly list can take advantage of that procedure, or can people who are delayed, you know, who are not on that list, take advantage of that procedure? My understanding is it's only for the TSA's listed passenger. There are a few lists other than the no-fly list. They have another list called the selectee list, which is people who they think are dangerous enough to list, but not so dangerous that they can call them a terrorist who can't fly. I believe there are actually several other lists that you can challenge, but if you're not on a list, delay is not one of the things you can complain about. You can't go and say that my screening took too long to the TRIP program. That's just not a part of it. The CRCL program, again, the question that I think is relevant here is whether Congress intended that to be some kind of remedial scheme here, and essentially they created a complaint box, and that's it. There's no right to a hearing. There's no right to participation. There's no right to a finding of anything. There's not even any, as far as I understand, ability for the people that review CRCL complaints to discipline a TSA screener or to provide any sort of remedy other than a recommendation or an investigation. The remedy that was approved in Egbert is very bare bones. The dissent in Egbert harshly criticized the majority for it, but the remedial schemes proposed here by TSA are less than the bare bones that were found in Egbert. They are essentially nothing but a complaint box. I'd also like to bring up to the Court that essentially for certain types of claims, this is the only avenue because TSA also claims that Federal Tort Claims Act does not apply to them at the checkpoint because of the intentional torts exception. So assuming the government has its way here, as well as with its argument in other cases regarding the FTCA, essentially this would create a situation where TSA screeners are entirely immunized from judicial review, and that's no matter how badly a person is injured, no matter how intentionally it was done. As long as the government requires that the claim go before it rather than through a state law claim, which it can under the Westfall Act, there's simply just no judicial review. I'll close with this unless there are more questions. Egbert on page 1 says that, quote, in all but the most unusual circumstances prescribing a cause of action is a job for Congress, unquote. Here we have a Federal agency that touches 2 million Americans daily with the search practices going right up to the limit, asking the court for essentially absolute immunity for intentional constitutional torts, no matter how egregious and without a real administrative remedy existing at all. That's an unusual circumstance. That is the most unusual circumstance that I think that the court was talking about here. Providing something for these people through Bivens is the only means that we can use to vindicate their rights. So essentially the court would be choosing or not choosing but maybe feel compelled to remove all remedies at all. And that's not going to protect travelers. That's not going to protect our national security. Our national security isn't vindicated by having TSA screeners make up their own rules and apply them to people at the checkpoint randomly. While these screeners were busy yelling at my client for doing something he was allowed to do, they're distracted from doing something else. I welcome any further questions. I appreciate that closing argument. As you were speaking, something came to mind about I'd heard a statement about the Supreme Court's view of the Fourth Amendment in broad terms being that if it could happen to them, it might well be a Fourth Amendment violation. But it just seems like this is a very difficult area of the law. But I really appreciate your argument here today. So thank you very much, Mr. Corbett. Thank you, Your Honors. Mr. O'Hara. Very briefly, Your Honors, on the question of what level of generality is the court supposed to focus, I just wanted to direct the court's attention to page 1805 of the Egbert ruling. And it actually cites, first it discusses the Ninth Circuit ruling, and then it says that the specificity that the Ninth Circuit applied was, quote, deeply flawed. And then it cites actually a 1987 decision from the Supreme Court, Stanley v. United States. And if you go to that opinion, there's a longer and more helpful discussion of the various levels of generality that one could assess this Bivens question, the special factors inquiry. And Egbert sums up that ruling as saying, under the proper approach, a court must ask more broadly if there is any reason to think that judicial intrusion into a given field might be harmful or inappropriate. So I think it is really at its most broad. It is whether extending into the realm of TSA is potentially harmful. Well, could you respond to Mr. Corbett's argument that if we rule in your favor, TSA will be entirely immunized from judicial review regardless of how egregious their conduct may be? Yeah, I think, you know, on the one hand, that may very well be true and may very well be a bad outcome that is facilitated by the fact that Congress has not created a cause of action. I think the harm that that causes, whether that's true, is actually a more appropriate question for Congress and is itself a special factor counseling hesitation. But I don't know that it's true. It may be true for constitutional violations. That's certainly what the Bivens jurisprudence is saying. That's what happened to every claimant in all of these Bivens rulings is they end up with no cause of action. But, you know, state intentional torts or other remedies or the alternative remedies that Congress might provide, no matter how insufficient they are, what it comes down to is that this isn't a job for courts. This is a job for Congress. And so it may be that calling out that a plaintiff claimant has no right is the most that a court can do. And, indeed, that is what the Supreme Court has done in many cases. And just to follow up on that, and so the result of that also is that it doesn't matter the particular work that a TSA employee may be doing at the time. It's looked at at the agency level writ large. Is that correct? I think that's correct, yeah. I think if you go to Egbert and Stanley, the 1987 decision, you can go to the level of specificity of this complaint, TSA employees doing searches more broadly, TSA employees in airports more broadly, TSA itself. And I think the question really is at the most broad. Is expanding Bivens to an entirely new field? And that's back to this is a new context. This is a new field. That's the first step of the inquiry. Is expanding into this new field of allowing claims to proceed against TSA employees, is it potentially harmful? Is it going to have these system-wide consequences? That's the level of generality that is appropriate. Thank you very much. Thank you, Your Honors. Betty. A few points, Your Honors. First, with respect to the allegations of misconduct, my friend mentioned, TSA deplores harassing or discriminatory conduct of any kind, and those actions would be completely contrary to law, policy, TSA's commitments, and the training it provides its agents. TSA screeners who have engaged in misconduct have been disciplined, fired, and prosecuted for misconduct at the airport security checkpoints. So the lack of a Bivens action here does not mean that TSA agents are free or able to violate people's rights. Second, with respect to the alternative remedial scheme, the Court made clear that the question is not whether the alternative scheme would address the particular plaintiff's injury, but rather whether the political branches had provided what they consider to be alternate remedies. Third, the Court considered and rejected the argument in Egbert that Agent Egbert was not – I see that my time has expired. You can finish your thought question. That Agent Egbert was not involved in any high-level national security policy, foreign policy issues, but rather, as the Court put it, was a rank-and-file border patrol agent, and this was, as they said, a conventional excessive force claim, and still the question of national security was implicated because they were deciding whether to create a cause of action against border patrol agents generally. Thank you very much. Thank you. I want to thank counsel for both sides for a case Abley argued. It's been our tradition for a long time, at least pre-COVID, to come down from the bench and meet and greet counsel and shake their hands. Obviously, we're not doing that now, at least for the foreseeable future, but hopefully down the road we'll resume that tradition, and if you come back we'll give you two handshakes to make up for the one you missed today. So thank you very much.
judges: Albert Diaz, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.